# Wytheville.

BEACH AND ANOTHER v. BELLWOOD AND OTHERS.

June 15, 1905.

1. QUIETING TITLE—*Bill to Remove Cloud.*—A person in possession of land, with a fee simple title, may file a bill to remove a cloud from the title.

2. REFORMATION—*Fraud and Mistake—How Charged—General Relief.*—Where fraud or mistake is relied upon as a ground of equitable relief, the particular manner in which the fraud was committed or the mistake made, and the end or design to be accomplished, must be set forth in the pleadings. Where the facts stated in a bill show what was the real agreement between the parties, and that a material part was, by mistake, omitted from the agreement when it was reduced to writing, the bill is sufficient to entitle the party injured to a reformation of the written instrument under the prayer for general relief

3. PAROL EVIDENCE—*Varying Written Instrument—Mistake—Equitable Relief.*—Where there has been an omission of a material stipulation in a written instrument contrary to the intention of the parties and under a mutual mistake, equity will intervene to grant relief.

4. PAROL EVIDENCE—*Varying Written Instruments—Mistake—Equi'able Relief—Reformation.*—While parol evidence will not be received to vary, alter or contradict the terms of a valid written instrument, still if it be clearly shown by proof which is entirely satisfactory that, by mistake of the draftsman, a writing does not truly set forth the agreement of the parties as previously entered into by them, equity will correct the mistake so as to make the instrument conform to the real agreement of the parties. Such mistake may be shown by parol, but the evidence of it must be clear and convincing, and such as to leave no fair and reasonable doubt upon the mind that the writing does not correctly embody the intention of the parties.

Appeal from a decree of the Law and Equity Court of the city of Richmond in a suit in chancery. Decree for the complainant. Defendants Beach and Short appeal.

*Affirmed.*

The opinion states the case.

*Jo. Lane Stern* and *James Parker,* for the appellants.

*William L. Royall,* for the appellees.

CARDWELL, J., delivered the opinion of the court.

The facts out of which this controversy arises are as follows: Appellee, complainant in the court below, James Bellwood, was in the early part of 1898 the owner and occupant of a large farm, situated in Chesterfield county, immediately on the Petersburg turnpike, about seven or eight miles from the city of Manchester, and between appellee's farm and the city of Manchester there is a tract of 435 acres, then owned by one George A. Madill, of St. Louis, Mo., which latter tract will be spoken of here, as in the record, as the Madill tract. The Madill tract fronts about one mile upon the turnpike, extending back to James river, and includes the famous and historic spot called "Drewry's Bluff." For some years Bellwood had desired to become the owner of the Madill tract, as one that would make a most valuable addition to his own farm by giving it especial advantages, independent of its mere intrinsic value, and accordingly he had negotiations with Madill in reference to its purchase; and in consideration of his agreeing to exercise a supervision over it, Madill agreed that he could have a preference over all others in purchasing it in case he (Madill) resolved to sell it.

In the spring of 1898, Corbin Warwick, of the city of Richmond, conceived a scheme for building an electric railroad along said turnpike from Manchester to Petersburg, and laid his plans before William L. Royall, of the same city, who joined with him in the undertaking, and these two took into conference one John C. Short, of the city of New York, who represented to them that he was a broker of that city and connected closely

with strong financial people, amongst whom he could easily raise the necessary money for the enterprise if a charter of incorporation was secured. Thereupon an agreement was entered into between Warwick, Royall and Short, that Warwick and Royall should secure a charter for the enterprise, and Short was then to secure the necessary money, and whatever was realized as profits from the enterprise was to be divided into halves, of which Short was to have one-half and Warwick and Royall were to have the other half, to be divided equally between them. Warwick and Royall obtained the charter from the Legislature, incorporating the Richmond & Petersburg Electric Railway Company. Warwick's plan for the electric railroad, contemplated the acquisition of the Madill tract and the conversion of "Drewry's Bluff" into an ornamental pleasure ground, to which the electric road would carry hundreds of thousands of visitors each year. Warwick considered this park the most attractive feature of the scheme, and the one that would most surely make the enterprise a paying one from the beginning, and in this view both Royall and Short concurred, the latter considering it the pivot upon which the whole enterprise was to turn. In connection with that view, Short in a letter to Bellwood, of April 3, 1899, referring to proceedings by the R. P. & C. R. R. Co. to condemn a right of way through the Madill tract, says: "I am glad you notified the man who accompanied the sheriff that he had better notify his railroad company that the Madill land had been purchased for a public park, and that it was the corner-stone of the whole enterprise, and the carrying out of the plans would cost several hundred thousand dollars." Bellwood was of opinion that an electric road upon the pike from Manchester to Petersburg would be a paying one, and of the greatest value and importance to those who resided upon its line, and that it would be of the very greatest value and importance to himself, and he was willing to contribute of his time, labor, and money to secure its construction.

Warwick solicited Bellwood to obtain from Madill, for him (Warwick) an option to purchase the Madill tract, which Bellwood applied to Madill for, but he (Madill) refused to give Warwick the option. Thus matters stood until February, 1899, when Short came to Richmond, and he and Warwick went together to visit Belwood and the Madill tract; and as there had been so much talk about the acquisition of the Madill tract, Bellwood concluded the time had arrived when he must buy it, and he had a few days before this written to Madill concerning its purchase, and had received from him an offer to sell him the land for $5,000—$1,000 to be paid in cash, the rest in three annual notes, secured by deed of trust on the land, the purchase to be closed by February 20th. Bellwood showed this offer, which was in a letter from Madill, to Short and Warwick when they were on the visit to him just mentioned, and he told Short that if he was going to build the electric road he would let him have the land to be converted into a park in connection with the road, and also told him he had long wanted the land as an addition to his farm and would not allow it to go for anything or to anybody except the electric road. This was understood by Short at the time, and he agreed that the land should be taken as a part of the electric road scheme, saying that he would commence to build the road within thirty days and have it completed in ninety days, and that he would spend sixty thousand dollars on the park, etc. It was then further agreed that Short would put up the $1,000 cash payment; that Bellwood would buy the Madill land in his own name, giving his three notes for the deferred payments, and deed of trust on the land to secure them; and on this understanding Madill was notified by Bellwood that his offer was accepted, and was asked to send a deed to the property to a bank or trust company in Richmond, in order that the purchase might be closed. Short got the $1,000 from his son-in-law, Ferdinand Beach, and in the interval between closing the contract and settling for the land there was some discussion about how the title of the land was to stand,

there being some disagreement between Short, Warwick, and Royall upon this point.   Short and Warwick wanted a separate land company to hold the land, so that it would not be covered by the railroad mortgage, while Royall wanted the land conveyed directly to the railroad company so as to make that enterprise as strong as possible.   It was finally agreed that there should be a land company to hold the land, and in the mean time Short wanted the title conveyed to his son-in-law, Beach, but Bellwood raised the point that if this was done Beach might cut and remove the timber, the railroad scheme might fall through and he be left to pay for and take the land with the timber gone.   To meet this suggestion, it was proposed by Royall that the land be conveyed to Beach by a deed held in escrow till Belwood's notes were paid, which proposition was satisfactory to Short, except that he wanted to form the land company at once and get possession of the land, and to accomplish this it was agreed that a provision should be inserted in the escrow, that if the land company was formed and issued its bonds, not to exceed $100,000, on depositing $8,000 of these bonds as collateral security to Bellwood, the deed might be delivered to Beach, and with this understanding Bellwood was satisfied, he also understanding, as did the other parties to these negotiations, that the proposed land company and the electric railroad were to be under the same management and control.   This understanding being reached, Warwick being in possession of Beach's certified check for $1,000, Warwick and Bellwood and wife met at Royall's office to complete the the transaction.   Bellwood having entire confidence in Royall, left to him the preparation of all papers necessary to carry out the agreement between the parties.   Madill's deed conveying the property to Bellwood had been deposited with the State Bank, together with the deed of trust that Madill wanted, securing the deferred payments, and Royall prepared a deed conveying the Madill tract in fee simple to Beach, and also prepared an escrow paper, addressed to the State Bank, which

was expected to hold the deed, directing it to deliver the deed to Beach when he paid Bellwood's notes. The bank refused to hold the deed in escrow, and by agreement between the parties present it was left in the possession of Royall.

The escrow paper referred to, is as follows:

"To William L. Royall, Esq.:

"We herewith deposit with you a deed conveying the Drewry's Bluff tract of land on James river, in Chesterfield county, Virginia, to Ferdinand Beach, of New York, to be held by you until the notes of James Bellwood for $4,000.00 payable to George A. Madill and given for the deferred payments on said land, are paid by the said Ferdinand Beach. But if John C. Short, of New York, and his associates, shall organize the Drewry's Bluff Land Company, as proposed by them, and shall create a first mortgage subject to present deed of trust, on said Drewry's Bluff tract of land, to secure the payment of not more than $100,000 of bonds, then if they deposit with you $8,000 of said first mortgage bonds as collateral security to me that said Beach will pay or cause to be paid said notes, you will be at liberty to deliver said deed to said Beach, and the said Short and associates will be at liberty to withdraw $2,000 of said bonds whenever they pay $1,000 of said notes.

"JAMES BELLWOOD,
"HELEN E. BELLWOOD."

"April 14th, 1899.

Royall had been one of the interested parties in the transaction. He had been a party to all the negotiations, and knew them in all their details. He knew that Bellwood's position was that Short, Warwick, and Royall might have the land if they built the road, but that he allowed them to have it only upon the condition that the road was built, and reserved the land to himself unless the whole scheme, road and park together, was put into force and effect in conjunction, and as one enterprise, and that it was never contemplated by Bellwood that Short, Warwick, and Royall, or anyone else, should have

the land as a real estate speculation, or for any purpose other than for a park in conjunction with the electric road they had agreed to build. Bellwood having given Royal no specific instructions except that his rights, as he knew Royall understood them, were to be protected, signed all the papers that Royall told him to sign, including the escrow paper, and Royall, instead of setting out the whole understanding as he knew it to exist, drew the papers in the form in which they now stand.

Upon the deed from Bellwood to Beach and the escrow paper being deposited with Royall, things drifted along, Short keeping up his promises that he would soon have the money; but finally it became plain that he had no money, and had access to none with which to build the road. In the meantime Bellwood's first note for the deferred payments for the Madill tract, due in March, 1900, was about maturing, and he wrote Short and asked him what was to be done. Short replied that he was unable to pay the note, and said to Bellwood: "If you will pay it I will give you a $1,000 bond of the electric road." Whether Bellwood paid any attention to this offer or not does not appear, but, being bound for the note, he paid it at maturity. Some time thereafter all hope of the electric road being built through the efforts of Short, Warwick, and Royall vanished, and they sold out all of their interest in the enterprise to one Haner, representing some Ohio capitalists, in December, 1900, when the charter had only about three months to run. Royall and Warwick concede that Haner and Company got all their rights in the Madill land, but Short claims that he only sold his rights in the road and reserved his rights in the land.

This state of things having come about, Bellwood demanded that Royall return to him the escrow paper and the deed to Beach for the Madill tract, so as to make his title to the land complete, but Short objected, and Royall declined to deliver the papers to Bellwood, and told him that he must wait until the charter expired. Thereupon Bellwood filed his bill in this cause to compel Royall to surrender the escrow paper and deed to him, in order to quiet the title in him to the Madill tract.

The bill, after setting out at length and in detail the facts and circumstances hereinbefore stated, proceeds as follows:

"But your orator wishes to make this point clear: that he did not direct Royall to draw up the instructions (escrow paper) as they appear. He knew that Royall was cognizant of all of the facts in the case and approved of the arrangement; he had entire confidence in the integrity of Royall, and he instructed him generally to prepare the papers in such form as to protect him, and that was the whole of the instructions given. If Royall had carried out your orator's instructions literally he would have written a paper which recited all the facts as they have been detailed here. But, believing, as your orator did, that Short had secured the money for the enterprise, he wrote only so much of your orator's instructions as he thought necessary for your orator's protection as the matter then stood.

"Your orator wishes now to charge distinctly and categorically that there was a perfect understanding between Short, Royall, Warwick and your orator, that in thus acquiring this Madill tract it was acquired for the purpose of being an integral part of the proposed electric road, and that Royall, Short, and Warwick perfectly understood that your orator took the part he did in the transaction to make said tract an integral part of said road, and that he would never have permitted that tract to have passed away from himself except to be an integral part of said road. Short, Warwick, and Royall all understood this perfectly, and all assented and agreed to it. To make this clear Dr. Ferdinand Beach wrote Short a letter, of which a copy is filed as a part of this bill, marked as Exhibit No. 3, and Short deposited that letter with Royall, who holds it now. In a proceeding to condemn a right of way through this Madill tract, Short appeared as a witness and testified that the tract was to be an integral and most important part of the road.

"It is true that while Short, Royall and Warwick were the equitable owners of the proposed road, they sometimes contemplated having a separate land company to own the park and

sometimes contemplated that it should be owned by the Old Dominion Construction Company, and sometimes contemplated that the railroad company should own it directly, and your orator knew of these changes in their purposes. But he also, knew that Royall, Short and Warwick would be the owners of whichever company held the park and the said railroad company also, and he was indifferent as to the form in which they held the park so long as both road and park were owned by the same parties. In point of fact the last resolution upon the subject reached by Short, Royall and Warwick was come to in the summer of 1899, and they then determined that the park should belong to the railroad company directly, and this resolution has never yet been altered by them, and it would be a serious and irreparable injury to your orator, in violation of your orator's rights, if he lost this tract of land by its going to any one but an electric railroad such as he has taken part in securing."

In the letter filed as Exhibit No. 3 with the bill, written by Ferdinand Beach, addressed to Short, the writer says: "I am in receipt of your letter of the 24th instant advising me that by the terms of the contract you have recently signed for the construction and equipment of the Richmond & Petersburg Electric Railway, it is provided that the tract of four hundred and thirty-five (435) acres of land at Drewry's Bluff, which was purchased by Mr. James Bellwood in the interest of the railway company, but was conveyed to him, and by him to me in the same interest, and which conveyance was taken by me in trust, to be conveyed in due time to a land company to be organized for the creation and improvement of a park at Drewry's Bluff, on the line of the Richmond & Petersburg Railway, is to be conveyed in due time to the said railway company. The deed of conveyance from Mr. Bellwood to me is now held in escrow by Mr. W. L. Royall, of Richmond, for delivery to me on my order, in accordance with the terms upon which it is held in escrow.

"I therefore hereby make this declaration: The said land was purchased in the interest of the Richmond & Petersburg Electric

Railway Company, and that Mr. W. L. Royall, holding Mr. Bell-wood's deed to me, holds the same in the interest and for the benefit of said railway company, and that in due time the title of said land is to be conveyed to the railway company, either by the surrender to Mr. Bellwood of the deed I now hold, and the making of a deed by Mr. Bellwood direct to the railway company, or as an alternative the Bellwood deed to me is to be recorded and a deed is to be made directly from me to the railway company, as you as president of the Old Dominion Construction Company, may deem best and direct."

The bill makes the further averment, that "your orator is informed that the said John C. Short, after having been nothing but a burden upon and embarrassment to this enterprise from the beginning, claims now that the said Madill tract must pass under his control. Your orator recently demanded of the said Royall that he surrender to him the said deed held by him in escrow, but the said Royall refused to do so unless authorized thereto by said Beach and said Short. Your orator thereupon visited New York, saw J. C. Short, and tendered to him as agent for Dr. Beach the $1,000 advanced by him, with interest to the time of its tender, but the said Short as Beach's agent refused to receive the same, and set up a claim to the said property for himself and associates.

.     .     .     .     .     .

"There was no written agreement between your orator and Ferdinand Beach, or between your orator and Short, and any one else, nor any memorandum or note in writing signed by your orator or his agent whereby your orator agreed to sell this property to Beach or Short, or to the said electric railway company, or to anyone else.

"So that your orator claims that he has never made any contract with any person or corporation whereby he has bound himself to part with this tract, and that the said Short vainly asserts that your orator is under any obligation of any sort in respect to the same, and that your orator's sole obligation is the equitable

one to return to Dr. Ferdinand Beach his $1,000 with interest, and this he is ready to do, and he prays the court that he may be allowed to bring the same into court and deposit it subject to the said Beach's order, as the court may allow him to have it."

. . . . . .

After making Short, Warwick, Royall, Beach and others deemed necessary parties to this suit, defendants thereto, the bill concludes: "Your orator shows that all of these facts and circumstances constitute a cloud upon his title to the said Madill tract of land, and he therefore prays that . . . your honor will decree that none of them (the defendants) have any such or any other claim upon the said tract of land, and that said decree shall bar each and every one of them forever from setting up a claim of any sort in, to, or upon said tract of land; that your orator may be permitted to deposit $1,000 and interest in this honorable court for the said Dr. Ferdinand Beach, and that therefore the said William L. Royall may be required to surrender to your orator the deed and declaration held by him as aforesaid in escrow," etc.

To this bill Short and Beach filed a joint and several demurrer and answer, and other parties named defendant, including the Richmond & Petersburg Electric Raiway Company, filed answers also; but it is not necessary for us to refer further to the answers other than that of Short and Beach, they being the only parties appealing from the decree of the lower court.

The answer of Short and Beach admits the correctness of many of the statements made in the bill, and with a general denial of all other allegations of the bill not admitted to be true, they make an elaborate and detailed statement of the facts and circumstances out of which this controversy has arisen. Among the statements contained in their answer is the following with reference to the purchase of the Madill tract of land: "Said Madill to make a deed in fee simple to the complainant for the consideration of five thousand dollars, payable $1,000 in cash, for the balance of said purchase price complainant to give his

three notes for $1,333.33 1/3 each payable to said Madill one, two and three years from date, with interest at six *per cent. per annum,* and execute a deed of trust upon said Madill tract to secure the payment of said notes; said respondent, Ferdinand Beach, to make the cash payment of one thousand dollars and agree to pay said notes, and complainant and wife to make a deed in fee simple of said Madill tract to said Beach and deliver the same to the State Bank of Virginia at Richmond, to be held by it until said Beach should pay said notes according to the terms of said deed of trust, and when said notes were so paid said bank was to deliver said deed to said Beach."

With reference to the letter, Exhibit No. 3 with the bill, written July 25, 1899, the answer says it was written long subsequent to the purchase of the Madill tract and to the execution of said deed, deed of trust and said notes, and when the control of both the railway company and the construction company was exclusively in Short, Warwick and Royall, and when it was not contemplated that such control would pass to outside parties. "And respondents further emphatically allege that said letter was written for the purpose of being used before the commissioners appointed in the proceedings instituted by said Richmond, Petersburg & Carolina Railway to condemn the right of way through the Madill tract, and for no other purpose whatever; and that having served its purpose and the conditions under which it was written having entirely changed, it has no bearing upon and is not applicable to the present condition of things."

In other words, these respondents admit in that letter all that the complainant, Bellwood, claims with reference to what was the real contract between them as to the Madill tract, but now say this was done for the purpose of misleading the commissioners appointed to assess damages to the property by building the line of the R. P. & C. Railway through the Madill tract, and should not be regarded as any admission from these respondents of the correctness of the complainant's position with refer-

ence to the Madill tract in a controversy in which they are claiming, or at least Beach claims, an exclusive right to the Madill tract in the face of what was the real agreement between these respondents and Bellwood. Short, in his joint answer with Beach, notwithstanding the assertions theretofore made of his rights in the Madill tract which were instrumental in preventing the delivery back to the complainant of the deed and escrow deposited with Royall, says that he has no claim or title whatever to said Madill tract or any part thereof, while Beach alleges and claims that he is the owner in fee simple of the whole of said Madill tract, subject only to the obligation assumed by him to pay the whole of said notes with interest, etc.

Upon the hearing of the cause upon the bill of complaint, the exhibits therewith, the demurrer thereto and the answers of Short and Beach and others, the voluminous testimony introduced by both parties consisting of depositions and numerous letters and other writings, the court below overruled the demurrer and granted the prayer of the complainant, the decree directing the defendant Royall to deliver to Bellwood the deed from him and wife to Beach for the Madill tract, and the escrow paper hereinbefore referred to; and further decreeing that each and every defendant to the cause be forever barred and enjoined from asserting any claim or demand whatever upon and against the Madill tract of land, but before Royall was authorized to surrender said deed and escrow paper to Bellwood, and before Bellwood could have any advantage whatever under the decree, he or some one for him should deposit in the Union Bank of Richmond to the credit of the court in this cause, the sum of one thousand dollars with interest thereon from April 14, 1899, until the day of such deposit, less the cost of this suit, etc. From this decree Beach and Short alone appeal to this court.

The bill filed by appellee, Bellwood, avers that he took a conveyance of the tract of land (Madill tract) and went into the possession thereof, and makes the deed a part of the bill, which deed conveys to Bellwood a fee simple title; and the other aver-

ments of the bill, the material parts of which we have already stated, make a case for the jurisdiction of a court of equity to grant the relief prayed, and therefore the demurrer of appellants to the bill was properly overruled.

The main question presented is whether or not parol evidence is admissible to prove the case stated, and it is contended for appellants that the bill is not sufficient to entitle Bellwood to the relief he seeks on the ground of mistake. It is a settled rule of law that the decree must be restricted to the case made by the pleadings, and it is equally well settled that where relief is sought on the ground of mistake or fraud, the mistake or fraud, as the case may be, must not only be charged but must be proven by clear and satisfactory proof. When mistake or fraud is relied on, the ground of relief should be charged by setting forth the particular manner in which the mistake was made or fraud was committed, and the end or design to be accomplished. Where the facts stated in the bill show what was the real agreement between the parties and that a material part was by mistake omitted when the agreement was reduced to writing, the bill is sufficient to entitle the party injured to a reformation of the written instrument under the prayer for general relief.

The court is of opinion that the bill sets out a state of facts showing a mistake, a mutual mistake, in the making and execution of the escrow paper filed with W. L. Royall. If the proofs, however, are doubtful and unsatisfactory to show that there has been the mistake averred in the bill, equity will withhold relief upon the ground that the written paper ought to be treated as the full and correct expression of the intent of the parties; but equity interferes in case of written instruments, where there has been an omission of a material stipulation contrary to the intention of the parties and under a mutual mistake. Story on Equity, 152, 155.

The rule relied on by appellants is thus stated in Greenleaf on Evidence, section 275: "Where parties have deliberately put their engagements into writing in such terms as to import a

legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties and the extent and manner of their understanding was reduced to writing; and all oral testimony of a previous colloquium between the parties, or conversation and declarations at the time it was completed, or afterwards, is rejected."

If there were no qualifications to this rule, there would be no such thing as reforming a written contract, but the qualifications to the rule are as clearly established as the rule itself.

In section 866, Beach on Mod. L. of Con., the author says: "When an agreement is made and reduced to writing, but, through mistake, inadvertence, or fraud, the writing fails to express correctly the contract really made, a court of equity will reform the instrument in conformity with the real intention of the parties. Accordingly, where an instrument is drawn and executed which professes or is intended to carry into execution an agreement previously entered into, but which by mistake of the draughtsman, either as to fact or law, does not fulfil, or which violates the manifest intention of the parties to the agreement, equity will correct the mistake so as to produce a conformity of the instrument to the agreement." See also to same effect Kerr on Fraud & Mistake, p. 418.

In *Slaughter* v. *Smither,* 97 Va. 202, 33 S. E. 544, it was sought to set up by parol evidence a contract between the parties inconsistent with the written agreement entered into by them and upon which they had acted, without averment or proof of fraud or mistake in the preparation of the written agreement.

All that is held in *Towner* v. *Lucas,* 13 Gratt. 705, applicable to the case under consideration, is that parol evidence will not be permitted to add a parol agreement to a written contract which is inconsistent with and contradictory of it. That is not this case.

In *Mauzy* v. *Sellars,* 26 Gratt. 641, the syllabus is: "A court of equity will correct a mistake clearly proved by parol evi-

dence, in an agreement for the sale and purchase of real estate; and this, whether the contest is between the vendor and purchaser, or the vendor and creditors of the purchaser." In the opinion by the learned Judge Staples, reviewing both the American and the English decisions as to the power of a court of equity to give relief against any deed or contract in writing founded on mistake or fraud, it is said: "These and a multitude of other cases which may be cited, show it is the constant practice of the equity courts to admit parol evidence of mistake of fact, and though such evidence is in direct contradiction of the express terms of the deed or other writing. Kerr on Fraud & Mistake, 418, 423. The only limitation on this doctrine is, that the evidence in all such cases must be very strong and clear, such as to leave no fair and reasonable doubt upon the mind, that the writing does not correctly embody the intention of the parties. If, therefore, the controversy here was between the vendor and purchaser, parol evidence is clearly admissible to establish the alleged mistake in the written agreement, even against the answer of the purchaser."

The opinion quotes from 1 Story's Eq. Jur., sec. 152, as follows: "One of the most common classes of cases in which relief is sought in equity on account of mistake of fact is that of written agreements, either executory or executed. Sometimes by mistake the written agreement contains less than the parties intended; sometimes it contains more; sometimes it simply varies from their intent by expressing something different in substance from the truth. In all such cases, if the mistake is clearly made out by proof entirely satisfactory, equity will reform the contract so as to make it conformable to the precise intent of the parties.

"A court of equity would be of little value if it could suppress only positive fraud, and leave mutual mistakes, innocently made, to work intolerable mischief, contrary to the intention of the parties. It would be to allow an act originating in innocence to operate ultimately as a fraud, by enabling the party who re-

ceives the benefit of the mistake to resist the claims of justice under the shelter of a rule framed to prevent it. In a practical view, there would be as much mischief done by refusing relief in such cases as there would be introduced by allowing parol evidence in all cases to vary written contracts." See also *Alexander* v. *Newton,* 2 Gratt. 260.

The quotation from Story is peculiarly applicable to the case we have under consideration.

We shall not attempt to review the evidence at length. The greater portion of it is immaterial. The real agreement between the parties, Bellwood on one hand and the appellants on the other, appears from the averments of the bill which we have very fully set out, and which are sustained by the testimony of Bellwood, Warwick and Royall, by letters and documents, and is, practically, not contradicted by any one except Short, whose testimony is not only inconsistent with, but contradictory in many respects of, statements made by him orally and in writing prior to the institution of this suit. That Royall was expected to set out Bellwood's rights by embodying the real agreement as to the Madill tract in the escrow paper, and that it was Royall's neglect or carelessness that this was not done is testified to by both Bellwood and Royall, and there is no testimony to the contrary. It was understood, not only as between Bellwood, Short, Warwick and Royall but by Beach himself, that Bellwood was not to part with the title to the Madill tract until Short fulfilled his promise and undertaking, and not only provided money with which to build the electric road from Richmond to Petersburg, but to pay for the Madill tract which was then to become an integral part of the electric road enterprise. That Beach so understood, that this was the real agreement embodying the only terms upon which Bellwood was to part with the title to the Madill tract, is clearly disclosed by the letter written by Beach to Short, which is filed as Exhibit A with Bellwood's bill, and which we have set out in full. In his testimony, Short admits that he not only dictated but wrote that letter for Beach to sign,

and this conclusively shows that the real contract with Bellwood with reference to the Madill tract, and for which Bellwood is now contending, was not only understood by Short, but was understood and acquiesced in by Beach; so that any paper setting out the terms and conditions upon which a deed from Bellwood to Beach for the Madill tract was to be delivered to Beach, and which omitted the stipulation that Bellwood was not to part with the title to the property except in the event that Short, Warwick and Royall built the electric road and the land became an integral part of that enterprise, was a mistake—a mutual mistake—which if not corrected would be a manifest injustice to Bellwood.

It may be that Beach "was not in this matter for his health," as his counsel puts it, but it is clearly the case that he had no connection with it except to advance, at the instance of his father-in-law, Short, the thousand dollars which was paid on the Madill tract, and which he understood was to be purchased and held in accordance with what was the real agreement between the parties concerned, and neither he nor Short ever suggested anything to the contrary of Bellwood's contention as to what the agreement was until long after Short had failed to provide the money with which to build the electric road and pay for the Madill tract, and the road had been built, or was in the process of being built, by other parties; so that it became very desirable for Beach and Short to acquire title to the Madill tract for speculative purposes.

It would be almost, if not quite, absurd to say that Bellwood paid his first note for the deferred payments on the Madill tract because induced to do so by the offer of Short to give him a thousand dollar bond of the electric road, when Short had no interest in such a road in process of being built, and Bellwood, as well as Short, then well knew that it would not be built as the result of any efforts of Short. The facts are, that Beach had then no expectation that the conditions upon which the Madill tract was to be conveyed to him would ever come about, and relying upon

getting back his $1,000 out of the Madill tract, he simply abandoned all connection with the purchase of the property, and Bellwood, who was not only bound for the notes he had given, but was in possession of the property and paying taxes thereon, naturally went forward and paid the note; and when it was clearly seen that the conditions upon which he alone was to part with the title to the Madill tract would never be brought about, he, also very naturally, demanded of Royall the return of the deed deposited with him, in order that his title to the Madill tract might be made clear.

Upon the whole case, we are of opinion that there is no error in the decree complained of, and it must, therefore, be affirmed.

*Affirmed.*